[Cite as *State v. Primm*, 2016-Ohio-5237.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 103548

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## TONY PRIMM

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-594182-A

**BEFORE:** E.T. Gallagher, J., E.A. Gallagher, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** August 4, 2016

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
820 West Superior Avenue
Suite 800
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:   Owen M. Patton
       Blaise D. Thomas
       Frank Romeo Zeleznikar
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, J.:

**{¶1}** Defendant-appellant, Tony Primm ("Primm"), appeals from his convictions and sentence following a jury trial. He raises the following assignments of error for review:

> 1. The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(a), on the charge of aggravated murder, and thereafter entering judgment of conviction on that offense as that charge was not supported by sufficient evidence, in violation of defendant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution.
>
> 2. Appellant's convictions are against the manifest weight of the evidence.
>
> 3. The trial court infringed upon and violated appellant's right to testify when it ruled that if he testifies, then his prior murder case comes in, which resulted in the jury improperly hearing about it.
>
> 4. The trial court erred when it admitted other acts testimony in violation of R.C. 2945.59, Evid.R. 404(B), and appellant's rights under Article I, Section 10 of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution.
>
> 5. The trial court erred by ordering appellant to serve a consecutive sentence without making the appropriate findings required by R.C. 2929.14 and H.B. 86.

**{¶2}** After careful review of the record and relevant case law, we affirm Primm's convictions and sentence.

## I. Procedural and Factual History

**{¶3}** In April 2015, Primm was named in a 14-count indictment, charging him with aggravated murder in violation of R.C. 2903.01(A) (Count 1); murder in violation of R.C. 2903.02(B) (Count 2); felonious assault in violation of R.C. 2903.11(A)(1) (Count 3);

two counts of attempted aggravated murder in violation of R.C. 2923.02 and R.C. 2903.01(E)(2) (Counts 4 and 5); two counts of felonious assault in violation of R.C. 2903.11(A)(2) (Counts 6 and 7); one count of improperly discharging a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3) (Count 8); five counts of improperly discharging into a habitation in violation of R.C. 2923.161(A)(1) (Counts 9, 10, 11, 12, and 13); and one count of having a weapon while under disability in violation of R.C. 2923.13(A)(3) (Count 14). Counts 1 through 9 contained various firearm specifications, ranging from one-year specifications to seven-year specifications.

{¶4} Primm's indictment stems from the shooting death of victim, Clifford Cunard ("Cunard"), at the home of Primm's mother, Anita Primm ("Anita"), and Primm's actions during his subsequent flight from the police. The matter proceeded to a jury trial in September 2015, where the following pertinent evidence was adduced.

{¶5} Timothy Allen ("Allen") testified that he knew Primm from the neighborhood. At approximately 1:00 a.m. on March 14, 2015, Allen observed Primm and three or four other people sitting inside Primm's vehicle, which was parked in Anita's driveway. Allen testified that he approached Primm's vehicle and began talking to "a couple of [his] friends in the back seat." At some point during the conversation, Primm asked Allen, "[w]hy you walking up to my truck like that?" Allen testified that he looked down and noticed that Primm had a revolver in his hand and was waving it at Allen. Allen asked Primm "if he was for real," and Primm responded, "[d]on't be walking up to my truck like that." Frightened, Allen immediately walked away from

Primm's vehicle and got into his own vehicle. Allen testified that he quickly backed up in reverse "trying to get away from [Primm]" and accidently hit his friend's brother's parked car. Once Allen observed Primm leave the scene in his vehicle, he called 911 at 1:35 a.m. and reported Primm's act of "pulling a gun on [him]."

{¶6} Eva Traylor ("Traylor") testified that she lives across the street from Anita and has an unobstructed view of her home. On March 14, 2015, she heard a big crash at approximately 1:30 in the morning. When she went outside, she saw Allen coming up her front stairs and her son's 2002 Pontiac "smashed up" on the street. Traylor testified that she had learned that Allen hit her son's vehicle as he was backing out of Anita's driveway. Traylor explained that "Allen was fleeing for his life" at the time of the accident.

{¶7} Traylor called the Garfield Heights police, who arrived at her residence and took information about the accident. Once the Garfield Heights police left, Traylor went back into her home and attempted to calm down her son who was upset about the damage to his vehicle. At approximately 2:30 a.m., Traylor observed Primm return to Anita's home in his vehicle. Traylor testified that she was familiar with Primm and his vehicle because he frequently visited his mother's home.

{¶8} Upon seeing Primm, Traylor immediately called 911 because she wanted the police to investigate Primm's involvement in the car accident and "didn't want her son to go over there and say anything [to Primm]." Police records reflect that Traylor placed the 911 call at 2:27 a.m. Traylor testified Primm did not immediately go inside his

mother's home.  Instead, Primm remained in the driveway for what "seemed like a long time."   During her recorded 911 call, Traylor described Primm's conduct to the dispatcher as "odd," stating that he was "getting in and out of his car," and was going back and forth between the front seat and the back seat of the vehicle.   Officer Matthew Krejci ("Officer Krejci") testified that on March 14, 2015, the Garfield Heights police received a 911 call for an incident involving "somebody pulling a gun out on somebody."  Later that evening, Officer Krejci received a 911 call from Traylor indicating that "the subject was back in the driveway of his mother's house."   At that time, Officer Krejci relayed the information to on-duty officers.   Officer Krejci testified that Traylor described everything Primm was doing in the driveway, including walking to and from different areas of his vehicle.

{¶9} Garfield Heights Police Officer Vinson Walker ("Officer Walker") testified that on March 14, 2015, at approximately 2:30 a.m., he received a call from dispatch indicating that Primm was at his mother's residence.   Officer Walker testified that this was significant because they had received a complaint that Primm had pulled a gun on someone earlier that evening.   Officer Walker and his partner, Officer Robert Jarzembak ("Officer Jarzembak"), responded to the scene approximately five minutes after Traylor's 911 call was placed.   Officer Walker testified that he and Officer Jarzembak took position in a parking lot across the street from Anita's residence and waited for police backup before approaching Primm.   From this position, Officer Walker observed Primm going in and out of his vehicle and back and forth from the driver's side door and the rear

of the vehicle. Officer Jarzembak testified that Primm seemed "like he was looking for something or preparing something."

{¶10} At approximately 3:00 a.m., Officer Walker observed Primm enter the residence through the front door. At approximately 3:03 a.m., "Primm exit[ed] the front door and [ran] to the vehicle where he jump[ed] in the driver's side, start[ed] the vehicle, pull[ed] out quickly and [left] at a high rate of speed." Officer Walker testified that he followed Primm's vehicle and activated his overhead lights. At that time, Primm failed to stop and accelerated his vehicle. Officer Walker testified that he determined that it was necessary to terminate his pursuit due to Primm's high rate of speed and reckless driving. Officer Walker then observed Primm crash his vehicle into the front porch of a residential home. Officer Walker testified that Primm exited the vehicle with a rifle and began firing at his police cruiser. Officer Walker testified, "emotionally, I figured he was trying to kill me * * * he was firing a level weapon towards our position." Officer Walker estimated that Primm fired his rifle six or seven times. Officer Walker returned fire until Primm threw down his rifle and put his hands in the air. At that time, Officer Walker approached Primm and took him into custody. In the process of detaining Primm, Officer Walker kicked Primm in the left side of his face in order to prevent him from reaching for the rifle.

{¶11} Officer Walker identified pictures of the rifle that was recovered from Primm. In addition, Officer Walker identified a .380 caliber semiautomatic pistol that was discovered in Primm's vehicle next to the driver's seat.

{¶12} At the time of the incident, Anita was living in her home with her son, Duran Primm ("Duran"). Anita testified that on March 13, 2015, she invited Cunard to her home to watch movies and drink alcohol. At some point in the evening, Anita observed her sons Duran and Primm come inside her home after a night of drinking. Later that evening, Anita and Cunard began to argue after she told Cunard she was not willing to commit to a relationship with him. Anita testified that during the argument, Cunard pushed her as she was walking out of her bedroom, causing her to bump into a desk and fall into the hallway. Anita testified that Primm saw her fall in the hallway. Anita picked herself up and immediately went into the bathroom. While she was in the bathroom, Anita heard a commotion and then heard four gunshots. When she came out of the bathroom she saw Cunard lying on the floor. According to Anita, the police arrived "very fast," and she was taken to the police station for questioning.

{¶13} Portions of Anita's video-recorded conversation with the police were played in open court. The state argued that it was necessary to play the video recording in open court because "[Anita]'s now fabricating a new set of events that she never described to the police during her interview that morning, and she's an adverse witness, mother of the defendant, and doesn't have a complete recollection even of her own interview." The video reflects that Anita did not mention an argument with Cunard or the fact that he had pushed her, despite being questioned by the police within hours of the shooting,.

{¶14} Primm's brother, Duran, testified that on the night of the incident, he and Primm went to a party and were drinking. Duran stated that he became heavily

intoxicated and had Primm drive him home at approximately 12:00 or 1:00 a.m. Duran stated that he fell asleep in the backseat of Primm's vehicle and immediately went to sleep once he arrived at his mother's home. He testified that he woke up to the sound of people arguing and then heard gunshots. When Duran opened his bedroom door, he saw Cunard lying on his mother's bedroom floor.

{¶15} During his cross-examination, Duran testified that Anita and Cunard had arguments and incidents of physical violence in the past. Duran stated that Cunard carried a gun and had anger problems. After playing his video-recorded interview with the police, however, Duran admitted that he did not tell the police during the interview that Cunard carried a gun or that his mother and Cunard had a history of arguments and physical violence.

{¶16} Brenda McNeely ("McNeely") is employed with the Ohio Attorney General's Bureau of Criminal Investigation as a special agent in their Major Crimes Division and is assigned to the Crime Scene Unit. On March 14, 2015, she responded to the scene of the homicide. McNeely testified that the deceased male, identified as Cunard, was found in the bedroom on the main floor. McNeely stated that the victim was "lying face down in a prone position, wearing a t-shirt, underwear, and white socks." McNeely described a gunshot wound on the back of Cunard's neck and also gunshot injuries to his abdomen area. In the course of her investigation, McNeely discovered a receipt for the purchase of a Cobra .380 firearm. McNeely testified that the firearm was found in a firebox in the upstairs bedroom and listed Primm's name as the purchaser. In

addition, McNeely discovered five .380 cartridge cases within the main floor bedroom. Once Cunard's body was moved, McNeely found "one bullet, spent projectile," where Cunard's body had been.

{¶17} Dr. Harold Schaefer ("Dr. Schaefer") is the Chief Toxicologist for the Cuyahoga County Medical Examiner's Office. Dr. Schaefer, without objection, was classified as an expert witness. Dr. Schaefer reviewed his department's work in the autopsy of Cunard. Dr. Schaefer testified that Cunard's body contained a blood alcohol concentration of .092, and small traces of caffeine, morphine, hydrocodone, phencyclidine ("PCP"), tramadol, and sildenafil.

{¶18} Dr. David Dolinak ("Dr. Dolinak") of the Cuyahoga County Medical Examiner's Office was the primary forensic pathologist in the autopsy of Cunard. Dr. Dolinak opined, within a degree of medical certainty, that Cunard died as a result of gunshot wounds, and that it was a homicide. Dr. Dolinak testified about each of Cunard's six gunshot wounds. Dr. Dolinak testified that gunshot number one went through the right upper neck and through the carotid artery. The bullet continued through the neck and into the brain. Dr. Dolinak testified that gunshot wound number one contains signs of "stippling," which is "tiny scrapes of the skin caused by the little bits of gunpowder actually becoming embedded in the skin." Gunshot number two also went through Cunard's neck and continued through his right shoulder. Gunshot number three went through Cunard's abdomen and stopped in the muscle near the lower backbone. Gunshot number four entered Cunard's left shoulder and continued downward in his

back. Gunshot number five entered Cunard's abdomen and continued through his liver, intestines, groin, and stopped in his buttock. Gunshot number six went through Cunard's right hand.

{¶19} At the conclusion of the state's case, Primm moved for acquittal on all counts pursuant to Crim.R. 29. The trial court denied the motion and the defense proceeded with its case.

{¶20} Margarette Harrison ("Harrison") testified that she is Primm's girlfriend. On the night of the incident, Harrison was with Primm celebrating her birthday. Harrison testified that she and Primm attended a house party and left around midnight to drop off Primm's brother, Duran, at his mother's house. Harrision stated that while they were parked in Primm's mother's driveway, a man named "Tim" pulled up behind Primm's vehicle. Harrision testified that she could tell that Tim was drunk. According to Harrison, Tim was slurring his words and smelled of alcohol. Harrision felt threatened by Tim based on several statements he made to Primm during their conversation. When Tim finally left, he reversed backwards and hit a parked car. At that time, Harrison told Primm to take her home. Harrison testified that when Primm dropped her off at her house, she told him to go back to his mother's house because she has kids and feared Tim would come to her house looking for Primm.

{¶21} Primm testified on his own behalf. Primm testified that on March 13, 2015, he attended a party with Duran and Harrison. Around midnight, he and Harrison decided to drive Duran to his mother's house. He testified that he took Duran, who was

intoxicated, into his mother's house and helped him get into bed. At that time, Primm noticed that Cunard was visiting his mother. Primm went back outside to his vehicle. While in his car, Allen pulled up behind him and approached his vehicle. Primm testified that Allen was acting "belligerent and was talking crazy." He described Allen as being "drunk and violent." Primm testified that he asked Allen to leave because he was scaring Harrison. Primm denied ever pulling a gun out on Allen. Primm testified that once Allen finally left, he observed Allen crash his vehicle into a park car. Primm then drove Harrison home and grabbed a rifle and "his other gun" before heading back to his mother's house. He claimed that he brought his guns with him to Anita's house because he was scared of Allen.

{¶22} Primm testified that when he arrived at Anita's house he could not find his cell phone inside his car. Primm stated that he looked for his phone in his car for several minutes before he finally went inside. Once he entered the home, Primm immediately observed his mother on the ground. Primm testified that he heard Cunard yelling and that Cunard was acting belligerent and hostile. Primm testified that he was attempting to calm Cunard down when Cunard suddenly hit him in the face. Cunard then threatened Anita, stating, "I'm going to kill you b****." Primm testified that Cunard "made a gesture like he was going to grab something." Primm stated that he "panicked," pulled his firearm from his waistband, and shot Cunard several times. Primm testified that "[he] was scared and thought [Cunard] was going to kill him and his mother." Primm

stated, "so at that point I pretty much panicked, you know. I never shot nobody before. I pretty much panicked, I jumped in my truck and I sped off."

{¶23} Primm testified that he never saw officers as he fled the scene and that he only stopped driving because he "tapped the porch" of a residential home. Primm testified that when he got out of his vehicle he slipped, causing his rifle to go off a couple of times by accident. Primm further testified that he was never kicked in the forehead by Officer Walker and that the cut on his forehead was the result of Cunard hitting him in the face.

{¶24} Prior to Primm's cross-examination, the state argued that Primm had opened the door to the introduction of Evid.R. 404(B) evidence regarding his 2012 murder trial when he testified that "he had never shot anyone before." The state maintained that the purpose of bringing in evidence of Primm's prior murder trial was "to prove the absence of mistake or accident." The state explained

> Essentially, what this [Primm] is saying is he didn't want it to happen, it didn't have to happen that way, it was all happening so fast. He is saying that he did not intend to do it. The fact that he has been around other instances of gunfire and shooting guns and being charged with a crime would seem to me to be indicative of the fact that this 404(B) could be used to establish in this case an absence of mistake or an absence of it being an accident on the part of this defendant, knowledge as to what happens when a firearm is fired, you know, his intent.
>
> * * *
>
> So this statement that he's never shot anybody before is arguably inaccurate, but even if he has not, he has been involved in other acts, even if they were not indicted that would indicate a familiarity with firearms.

Following a brief discussion on the record, the trial court ruled that it would permit the state to explore Primm's 2012 murder trial.

**{¶25}** During his cross-examination, Primm admitted that the Cobra .380 handgun recovered from his vehicle is the gun he used to kill Cunard on March 14, 2015. However, Primm claimed that he used the weapon in self-defense. He further reiterated his position that the discharge of the rifle towards the police was an accident.

**{¶26}** Following Primm's admission to purchasing the firearm used to kill Cunard, the following discussion took place on the record:

> PROSECUTOR:   And you said you never shot no one before; is that what I heard you say?
>
> PRIMM:   Yes, sir, I haven't.
>
> PROSECUTOR:   How did Antonio Williams die?
>
> DEFENSE COUNSEL:   Objection.
>
> THE COURT:   Overruled.
>
> PRIMM:   I believe Laf did it.
>
> PROSECUTOR:   All right.   Antonio Williams was your friend?
>
> PRIMM:   Yes, sir.
>
> PROSECUTOR:   You were charged with his aggravated murder?
>
> PRIMM:   I was found not guilty on the charges.
>
> PROSECUTOR:   And you beat it at trial —

DEFENSE COUNSEL:   Objection.

PROSECUTOR:   — you were found not guilty.

THE COURT:   Overruled.

PROSECUTOR:   Right?

PRIMM:            Yes, sir.

PROSECUTOR:        And in this case, that Cobra .380, you know through discovery that the gun was ballistically matched to be the same gun that killed Antonio Williams, don't you?

DEFENSE COUNSEL:            Objection.

THE COURT:            Overruled.   You may answer, if you know.

PRIMM:         That's what I was told, yes.

PROSECUTOR:         Okay.   And that gun miraculously was never found during Antonio Williams' homicide investigation, was it?

PRIMM:         Not to my knowledge, no.

PROSECUTOR:         Right.   But you were the original purchaser at Atlantic Gun and Tackle in 2006, I think the receipt says?

PRIMM:         Yes, sir.   But there's also other DNA on my gun.

PROSECUTOR:         It was in your possession for all those nine years that you testified that you owned it; isn't that right?

PRIMM:         No, sir.

PROSECUTOR:            Where did you hide it then, sir?

PRIMM:         I didn't hide it, other people had possession of it.   That's why there's other DNA on it.

PROSECUTOR:         Did you give it to your brother to hold it?
PRIMM:         No, Laf had it.   That's why he had Antonio Williams' blood on his clothes.

{¶27} At the conclusion of trial, the jury found Primm guilty on all counts and firearm specifications.   At sentencing, the trial court sentenced Primm to life in prison without parole with three-year gun specification on Counts 1 through 3.   The court

sentenced Primm to 18 years in prison each on Counts 4 and 5. Count 6 merged with Count 4 and Count 7 merged with Count 5. The court sentenced Primm to three years in prison on Count 8. Primm received eight years in prison each on Counts 9 through 13. On Count 14, Primm was sentenced to three years in prison. The court ordered Primm's sentences to run consecutively to each other for an aggregate prison sentence of "life without parole plus eighty-five years."

{¶28} Primm now appeals from his aggravated murder conviction and sentence.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶29} In his first and second assignments of error, Primm argues his aggravated murder conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Because Primm raises similar arguments in each assignment of error, we consider them together for judicial clarity.

### Standard of Review

{¶30} An appellate court's function when reviewing the sufficiency of the evidence supporting a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶31} In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion rather than production. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *Thompkins* at 387. This court reviews the entire record, weighs the evidence and all reasonable inferences, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶32} In conducting such a review, this court remains mindful that the credibility of the witnesses is primarily for the trier of fact to assess. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

### Aggravated Murder --- R.C. 2901.0(A)

{¶33} Primm was convicted of aggravated murder under R.C. 2903.01(A), which provides, in relevant part, "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." R.C. 2903.01(A).

{¶34} "'[P]rior calculation' and design * * * indicate[s] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the

victim." *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting 1973 Legislative Service Commission Comment to R.C. 2903.01. The phrase is not defined in the Ohio Revised Code, however, the Ohio Supreme Court has interpreted it "to require evidence of 'more than [a] few moments of deliberation'" and "'a scheme designed to implement the calculated decision to kill.'" *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 38, quoting *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph one of the syllabus. In other words, "[i]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.'" *Cotton* at paragraph two of the syllabus. "'[N]either the degree of care nor the length of time the offender takes to ponder the crime beforehand'" is a "'critical factor'" in and of itself so long as it amounts to more than "'momentary deliberation.'" *State v. D'Ambrosio*, 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993), quoting the 1973 Legislative Service Commission Comment to R.C. 2903.01. Although "'momentary deliberation' is insufficient," "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001).

{¶35} The state can prove "prior calculation and design" from the circumstances surrounding a murder in several ways, including (1) "evidence of a preconceived plan leading up to the murder," (2) "evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the [events] unfolded," or (3) "evidence that the murder was executed

in such a manner that circumstantially proved the defendant had a preconceived plan to kill," such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 75, citing *State v. Dunford*, 11th Dist. Ashtabula No. 2009-A-0027, 2010-Ohio-1272, ¶ 53; *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218 (10th Dist.); *State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2010-Ohio-2770, ¶ 19 ("[I]f the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design.").

{¶36} Whether a defendant acted with prior calculation and design is determined on a case-by-case basis, following an analysis of the specific facts and evidence presented at trial. *Orr* at ¶ 77; *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001); *see also State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 61 ("'Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.'"), quoting *Cotton* at paragraph three of the syllabus.

{¶37} There is no "bright-line test" for determining the presence or absence of prior calculation and design; however, the Ohio Supreme Court has identified several factors to be weighed along with the totality of the circumstances surrounding the murder in determining the existence of prior calculation and design, including (1) whether the

defendant and the victim knew each other and, if so, (2) whether the relationship was strained; (3) whether there was thought or preparation in choosing the murder weapon or murder site; and (4) whether the act was "drawn out" or "an almost instantaneous eruption of events." *Taylor*, citing *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976); *see also State v. Woods*, 8th Dist. Cuyahoga No. 99630, 2014-Ohio-1722, ¶ 25.

{¶38} The state may use either direct evidence or circumstantial evidence to prove the elements of a crime. *See, e.g., State v. Durr*, 58 Ohio St.3d 86, 92, 568 N.E.2d 674 (1991); *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus; *State v. Bokeno*, 12th Dist. Butler No. CA2011-03-044, 2012-Ohio-4218, ¶ 12. Circumstantial and direct evidence are of equal probative value. *Jenks* at paragraph one of the syllabus. Circumstantial evidence is "proof of facts or circumstances by direct evidence from which the trier of fact may reasonably infer other related or connected facts that naturally or logically follow." *State v. Seals*, 8th Dist. Cuyahoga No. 101081, 2015-Ohio-517, ¶ 32, citing *State v. Beynum*, 8th Dist. Cuyahoga No. 69206, 1996 Ohio App. LEXIS 2143 (May 23, 1996); *see also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("'Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.'"), quoting *State v. Griesheimer*, 10th Dist. Franklin No. 05AP-1039, 2007-Ohio-837, ¶ 26.

{¶39} However, not all inferences are reasonable and in establishing facts by means of circumstantial evidence, one inference cannot be based solely on another. Although a trier of fact cannot draw an inference based solely upon another inference, an inference that is based in part upon another inference and in part upon additional facts is a "'parallel inference'" and, "'if reasonable, may be indulged in.'" *State v. Cowans*, 87 Ohio St.3d 68, 78, 717 N.E.2d 298 (1999), quoting *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 130 N.E.2d 820 (1955), paragraph two of the syllabus. "'[C]ircumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 75, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990).

{¶40} Applying the foregoing, we find a rational trier of fact could have concluded beyond a reasonable doubt that Primm acted with prior calculation and design in murdering Cunard. While there was no evidence to suggest Primm and Cunard had a strained relationship, the testimony presented at trial demonstrated that Primm drove back to his mother's home with a handgun and a rifle in his possession after spending some time inside her home earlier that evening. In fact, Primm testified that when he dropped his girlfriend off at her home for the evening, he went inside and retrieved his handgun and rifle before driving back to his mother's home. The record further reflects that despite not living with his mother, Primm arrived at his mother's home at approximately 2:27 a.m. and was aware Cunard was visiting his mother that night. We recognize that

the "mere possession of a weapon is not, without more, evidence of prior calculation and design." *State v. Hicks*, 8th Dist. Cuyahoga No. 102206, 2015-Ohio-4978, ¶ 48. However, evidence that Primm left his mother's house, drove to his girlfriend's house at approximately 2:00 a.m. to retrieve two firearms, and then returned to his mother's house with the weapons demonstrates Primm's significant level of deliberation.

{¶41} In addition, several witnesses described Primm's action in the minutes leading up to the shooting death of Cunard. According to Traylor and Officer Walker, Primm was going in and out of his vehicle for approximately 30 minutes before he entered the home at 3:00 a.m. During her recorded 911 conversation, Traylor stated that Primm was acting "odd." Similarly, Officer Jarzembak stated that Primm appeared to be "preparing for something." Taking into consideration that Primm shot Cunard within minutes of entering Anita's home, we find Primm's odd and preparatory behavior in the driveway to be circumstantial evidence of Primm's "calculated thought process."

{¶42} Moreover, evidence of a preconceived plan is not the only way to prove the element of prior calculation and design. As stated, the state can also offer "evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill. *See Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218, ¶ 19. This allows the state to satisfy its burden by showing that the murder was executed in such a manner that circumstantially proves a preconceived notion that the victim would be killed regardless of the situation. *Id*. at ¶ 33. Thus, if the victim is

killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design. *Id.*

{¶43} In this case, Primm shot Cunard six times at close range, as evidenced by "stippling" found near Cunard's gunshot wound to his neck. The testimony at trial revealed that Cunard was unarmed at the time of the shooting and was discovered in his night-time attire near Anita's bed. Considering the totality of the circumstances, we find this cold-blooded killing bespeaks aforethought, not a sudden eruption of events, and provided circumstantial evidence of Primm's prior calculation and design.

{¶44} Viewing this evidence in a light most favorable to the prosecution, we find there was sufficient evidence to establish beyond a reasonable doubt that Primm acted with prior calculation and design in murdering Cunard.

{¶45} Moreover, we are unable to conclude that Primm's aggravated murder conviction was against the manifest weight of the evidence. In challenging the weight of the evidence supporting his aggravated murder convictions, Primm argues that the state's case relied on inconsistent and uncorroborated accusations. There is no dispute that this case involved many inconsistencies. For instance, Durand and Anita each offered testimony at trial suggesting, for the first time, that Cunard's death was the result of Primm's reaction to a physical altercation between Anita and Cunard. Despite this testimony, however, the jury was also presented with portions of the recorded police interviews of Anita and Duran, during which they never mentioned the physical altercation between Anita and Cunard. In addition, the jury was presented with

competing versions of Primm's interaction with Allen and competing versions of Primm's retrieval of the handgun he used to shoot Cunard. Recognizing these inconsistences, we find the jury, as the trier of fact, was in the best position to weigh the credibility of each witness and to resolve inconsistencies in their testimony.

{¶46} Deferring to the jury's assessment of credibility, as we must, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.

{¶47} Primm's first and second assignments of error are overruled.

## B. Primm's Right to Testify at Trial

{¶48} In his third assignment of error, Primm argues his "right to testify was constitutionally infringed upon by the trial court when it ruled that [Evid.R.] 404(B) evidence would come in if he testified."

{¶49} Prior to trial, the state filed a notice of intent to use evidence of Primm's prior bad acts under Evid.R. 404(B), arguing that evidence of Primm's 2012 murder trial was admissible to prove Primm's intent. Upon consideration of the state's arguments, the court ruled that if Primm did not testify, evidence of Primm's prior trial would not be permitted. The court found, however, that if Primm did testify, introduction of the Evid.R. 404(B) evidence may be appropriate. Primm argues the trial court's ruling amounted to a "Hobson's choice," which impaired his ability to freely choose whether to testify at trial.

{¶50} A defendant's right to testify in a criminal trial is regarded both as a fundamental and a personal constitutional right that is waivable only by an accused. *State v. Vaughn*, 8th Dist. Cuyahoga No. 87245, 2006-Ohio-6577, ¶ 32, citing *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). The right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution. It is a right that is "'essential to due process of law in a fair adversary process'" and thus falls under the protections of the Fifth and Fourteenth Amendments. *Rock* at 51, quoting *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call "witnesses in his favor" — which, of course, would include himself. *Rock* at 52 (citation omitted). In addition, the right to testify is "a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Id*.

{¶51} After careful review, we are unable to conclude that the trial court's evidentiary ruling infringed upon Primm's constitutional rights. Regardless of the trial court's statements concerning the introduction of other acts evidence, Primm testified at trial. Thus, he was afforded his constitutional guarantees and any arguments relating to the introduction of other acts evidence are better suited in an evidentiary challenge, as raised in Primm's fourth assignment of error.

{¶52} Primm's third assignment of error is overruled.

### C.   Other-Acts Evidence

{¶53} In his fourth assignment of error, Primm argues the court improperly allowed the state to introduce evidence of his 2012 murder trial in violation of Evid.R. 404(B).

{¶54} The trial court has broad discretion in the admission and exclusion of evidence, including evidence of other acts under Evid.R. 404(B). *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 22. Unless the trial court has "clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere" with the exercise of such discretion. *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

{¶55} Evid.R. 404(B) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence may, however, be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). Similarly, R.C. 2945.59 permits the admission of other acts evidence tending to show a defendant's "motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question."

{¶56} In determining whether to permit other acts evidence to be admitted, trial courts should conduct the three-step analysis set forth in *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, to (1) determine if the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more

or less probable than it would be without the evidence under Evid.R. 401, (2) determine if the other acts evidence is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B), and (3) consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *Id.* at ¶ 20.

{¶57} In this case, the trial court permitted the state to introduce evidence of Primm's 2012 murder trial following Primm's testimony that "[he] has never shot anyone before." The court determined that the evidence was offered for a legitimate purpose in order to show Primm's familiarity with firearms and his lack of mistake or accident in shooting Cunard.

{¶58} Applying *Williams* to the circumstances of this case, we find evidence of Primm's 2012 murder trial and subsequent acquittal was not presented for a legitimate purpose under Evid.R. 404(B). In our view, evidence of Primm's prior murder trial did not assist the trier of fact in determining whether, in this case, Primm's act of shooting Cunard was a mistake or the result of an accident. Most importantly, there were no arguments raised on behalf of Primm at trial that the shooting of Cunard was a mistake or an accident. Rather, Primm admitted to shooting Cunard, but claimed he acted in self-defense. Under these circumstances, the basis of the state's attempt to introduce Primm's prior bad acts related to an aspect of this case that was not in dispute — Primm

intentionally shot Cunard. Accordingly, we find the trial court abused its discretion in admitting the other-acts evidence at trial.

**{¶59}** However, even though the evidence was inadmissible, reversible error did not occur. The Ohio Supreme Court has instructed that in determining whether to grant a new trial as a result of the erroneous admission of evidence under Evid.R. 404(B), a court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record. *State v. Morris,* 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 33. "[A]n improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming." *Id.* at ¶ 32.

**{¶60}** On this record, the exclusion of Primm's prior murder trial from evidence would not have changed the outcome of the trial. In our view, the record contains overwhelming evidence to support Primm's convictions. *See State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 156; *State v. Tate*, 8th Dist. Cuyahoga No. 102474, 2015-Ohio-4496, ¶ 23-24. As stated, Primm admitted to shooting and killing Cunard, and the state presented substantial evidence regarding Primm's calculated conduct leading up to the shooting death of Cunard and his subsequent actions during the police pursuit. Accordingly, we find that the error complained of was harmless beyond a reasonable doubt and did not deprive Primm of his constitutional right to a fair trial.

**{¶61}** Primm's fourth assignment of error is overruled.

## D. Consecutive Sentences

**{¶62}** In his fifth assignment of error, Primm argues the trial court erred in imposing consecutive sentences without making the necessary findings under R.C. 2929.14(C)(4).

**{¶63}** R.C. 2953.08(G)(2) provides that when reviewing felony sentences, the appellate court may overturn the imposition of consecutive sentences where the reviewing court "clearly and convincingly" finds that (1) "the record does not support the sentencing court's findings under R.C. 2929.14(C)(4)," or (2) "the sentence is otherwise contrary to law." Our review of a claim that the record does not support the trial court's findings under R.C. 2929.14(C)(4) is "'extremely deferential.'" *State v. Balbi*, 8th Dist. Cuyahoga No. 102321, 2015-Ohio-4075, ¶ 5, quoting *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 21 (8th Dist.).

**{¶64}** In Ohio, there is a presumption that prison sentences should be served concurrently, unless the trial court makes the findings outlined in R.C. 2929.14(C)(4) to justify consecutive service of the prison terms. *State v. Cox*, 8th Dist. Cuyahoga No. 102629, 2016-Ohio-20, ¶ 3; R.C. 2929.41(A). R.C. 2929.14(C)(4) provides that in order to impose consecutive sentences, the trial court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender, that such sentences would not be disproportionate to the seriousness of the conduct and to the danger the offender poses to the public, and that one of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under postrelease control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

*State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 20-22.

**{¶65}** Compliance with R.C. 2929.14(C)(4) requires the trial court to make the statutory findings at the sentencing hearing, "and by doing so it affords notice to the offender and to defense counsel." *Bonnell* at ¶ 29. "Findings," for these purposes, means that "'the [trial] court must note that it engaged in the analysis' and that it 'has considered the statutory criteria and specifie[d] which of the given bases warrants its decision.'" *Id.* at ¶ 26, quoting *State v. Edmonson*, 86 Ohio St.3d 324, 326, 715 N.E.2d 131 (1999). Further, the reviewing court must be able to determine that the record contains evidence to support the findings. *State v. Davis*, 8th Dist. Cuyahoga No. 102639, 2015-Ohio-4501, ¶ 21, citing *Bonnell* at ¶ 29.

**{¶66}** A trial court is not, however, required to state its reasons to support its findings, nor is it required to give a rote recitation of the statutory language, "provided that the necessary findings can be found in the record and are incorporated in the

sentencing entry."  *Bonnell* at ¶ 37.   The failure to make consecutive sentence findings is contrary to law.  *Balbi*, 8th Dist. Cuyahoga No. 102321, 2015-Ohio-4075, at ¶ 4.

**{¶67}** In this case, the trial court stated the following when ordering Primm's sentences to be served consecutively:

> I made this record is because I want the record to demonstrate that this guy is the worst of the worst and, therefore, the longest possible prison sentence is necessary.
>
> * * *
>
> It is necessary to protect the public and to punish this offender by putting him away for as long as I possibly can.   Any sentence including death at the institution would not be disproportionate to the crimes that he has committed while under a sanction of this Court, and he was under a sanction that he was not permitted to own, possess or control a firearm.
>
> No one sentence in this case would adequately reflect the seriousness of this individual's conduct.   The harm here is so great, the murder of and, by the way, my condolences to the family because all of the testimony was that your uncle, Mr. Cunard, was a fine person.   He was completely within his right to be where he was at on the night in question.
>
> He was invited over to the residence by the woman that he was with and there was no credible testimony whatsoever that he caused any problem at all.   None.   So I wanted you to know that.
>
> Additionally, I also want to make this finding that obviously the offender's criminal history shows consecutive terms are necessary to protect the public, and the reason I'm doing this is because of, first of all, a murder.   Attempting to kill police officers, but in addition in 2006, a trafficking case; the very significant 2007 discharge of six shots into a house while under a weapons disability; the 2008 weapons disability; the 2008 drug case.   I mean he is on a terror here.
>
> He was acquitted of the 2012 murder where the record has been made to who owned that gun, so those factors indicate that the maximum period of incarceration is necessary[.]
>
> * * *

All the sentences imposed here are consecutive for all the reasons that have been placed upon the record.

**{¶68}** On this record, we find the trial court satisfied its statutory obligations for imposing consecutive sentences under R.C. 2929.14(C)(4) and incorporated its findings into the sentencing entry. Further, we cannot "clearly and convincingly" find that the record does not support the court's findings. Accordingly, Primm's sentence is not contrary to law.

**{¶69}** Primm's fifth assignment of error is overruled.

### III. Conclusion

**{¶70}** Primm's aggravated murder conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. The trial court did not infringe upon Primm's constitutional right to testify at trial. However, the trial court erred in admitting evidence of Primm's prior murder trial. The trial court's error was harmless beyond a reasonable doubt given the overwhelming evidence of Primm's guilt. Finally, the trial court made the necessary findings for imposing consecutive sentences pursuant to R.C. 2929.14(C)(4), and Primm's sentence is not contrary to law.

**{¶71}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having

been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
SEAN C. GALLAGHER, J., CONCUR