[Cite as *State v. Woods*, 2014-Ohio-1722.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 99630**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## NATHANIEL WOODS

DEFENDANT-APPELLANT

---

**JUDGMENT:**
CONVICTION AFFIRMED AS MODIFIED;
SENTENCE AFFIRMED IN PART AND VACATED IN PART;
REMANDED FOR RESENTENCING

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-557749

**BEFORE:** Keough, P.J., Kilbane, J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** April 24, 2014

**ATTORNEY FOR APPELLANT**

David H. Brown
David H. Brown, L.L.C.
The Gehring Building
1956 West 25th Street, Suite 302
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By: Norman Schroth
        Kevin R. Filiatraut
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, P.J.:

**{¶1}** Defendant-appellant, Nathaniel Woods, appeals from the trial court's judgment, rendered after a jury trial, finding him guilty of aggravated murder, gross abuse of a corpse, and tampering with evidence. Finding some merit to the appeal, we affirm Woods's conviction as modified herein, vacate the sentence for aggravated murder, and remand for resentencing.

## I. Background

**{¶2}** In December 2011, Woods was charged in a three-count indictment. Count 1 charged aggravated murder in violation of R.C. 2903.01(A); Count 2 charged gross abuse of a corpse in violation of R.C. 2927.01(B); and Count 3 charged tampering with evidence in violation of R.C. 2921.12(A)(1). He pleaded not guilty, and the case proceeded to a jury trial at which the following evidence was adduced.

**{¶3}** On the morning of December 14, 2001, as he was walking through a shortcut between Edna and Bayliss Avenues in Cleveland, Tyrone Ridley saw a badly burned body on the ground behind the garage at 6725 Bayliss Avenue. Ridley said the body had not been there the day before when he used the same shortcut. Ridley called a friend who was a CMHA police officer, who in turn called a Cleveland police captain.

**{¶4}** Cleveland police responded to the scene, where they took pictures and collected evidence. Cleveland fire and arson investigators also inspected the scene and determined that the fire that burned the body had been intentionally set.

{¶5} Dr. Joseph Felo, deputy medical examiner for Cuyahoga County, testified that the victim, identified as 23-year-old Kimberly Bolten, had been dead for less than two days when she was found, and that she died of "homicidal violence, type undetermined." Dr. Felo testified further that Bolten had suffered postmortem fourth-degree burns to most of her body, and that the burning made it impossible to determine the specific cause of death. He testified, however, that the most likely causes of Bolten's death were fatal stab or gunshot wounds to parts of her body that had been burned away, or a "suffocation-type" death. He based these conclusions on non-fatal, postmortem stab wounds to parts of the body that had not burned and a bruise on the underside of Bolten's tongue typical of those found on persons who have suffocated to death.

{¶6} Dr. Felo testified that Bolten had no medical history of seizures, and that the autopsy did not reveal any seizure disorder in her brain. He testified further that she "did not die because of a seizure," although he noted that "she has violence on her that may have resulted in a seizure." He explained that a lack of oxygen to the brain, caused by smothering, choking, or strangling, can cause a seizure and death. Dr. Felo also testified that he found recent bruising and swelling around Bolten's eyes that meant she could have been punched, grabbed, or smothered, and that he was certain that Bolten had suffered a violent death, although the exact cause of death could not be determined due to the extensive burning of the body. He admitted on cross-examination, however, that other than the burning, there was no trauma on Bolten's body that caused him to opine

that she had been murdered, and the postmortem burning of her body was very important to his conclusion that she had been murdered.

{¶7} Krystal Johnson, Bolten's sister, testified that she last saw Bolten at approximately 7 p.m. on December 12, 2011, when Bolten left the house she shared with Krystal to walk to the store. Krystal admitted that Bolten was a prostitute and used drugs. She testified that Bolten was approximately 5'10" tall and weighed about 170 pounds, and would stand up for herself and fight back if she were assaulted. Krystal said that Bolten was bipolar but denied that she had ever had a seizure.

{¶8} Natasha Frazier, a friend of Bolten's for five years, testified that she saw Bolten a few nights before her body was discovered. Frazier was driving her car and honked the horn at Bolten, who was walking up Addison Avenue in Cleveland with a man who was walking a bike. Frazier said that when she honked the horn, Bolten waved and continued walking with the man, who put his head down. Frazier identified Woods in court as the man she saw Bolten with that night.

{¶9} Thomas Renfroe testified that in December 2011, he lived on the third floor of a ten-room boarding house at 6722 Edna, Cleveland, Ohio. The south side of the property at 6722 Edna abuts the north side of the property at 6725 Bayliss Avenue, where Bolten's burned body was found. Renfroe said that Woods lived in the room next to his, and that his bed was against the wall that abutted Woods's room.

{¶10} Renfroe testified that on the evening of December 12, 2011, Woods came up the stairs to the third floor of the boarding house. He told Renfroe that he had met a

woman, who was downstairs using the bathroom. Renfroe said the woman came up the stairs, went into Woods's room, and sat on his bed; Renfroe then went back into his room. For awhile, he heard Woods playing music and singing to the girl.

{¶11} Renfroe testified that he eventually went to sleep but was awakened at approximately 1:30 or 2:00 a.m. by sounds from Woods's room of banging on the wall and beer bottles hitting the floor. Renfroe said that he got up and knocked on Woods's door. Woods did not answer, so Renfroe knocked again. Woods said, "What, man?" but did not open the door to his room. Renfroe said he asked, "You all right in there?" and Woods said "yeah," so he went back to bed.

{¶12} Renfroe said that as he lay in his bed, he heard the woman gasping and breathing hard, and Woods whispering to her, although Renfroe could not make out the words. In state's exhibit No. 294, Renfroe's subsequent written statement to the police, Renfroe stated that "it sounded like her mouth was covered up or her face was in a blanket or something like that," although Renfroe admitted that at the time, he just assumed the woman and Woods were having sex.

{¶13} Renfroe said that a few minutes later, Woods called him on his cell phone and thanked Renfroe for checking on him. Renfroe said that when he asked Woods what had happened, Woods told him that the girl tried to take his money, he twisted her arm, the money flew everywhere, and "it don't look too good." Woods then told Renfroe that he and the girl were going to sleep.

**{¶14}** Renfroe testified that when he got home from work the next day around 5 p.m., Woods was sitting on the porch of the boarding house. He told Renfroe, "You know that girl I was with the other day? She dead." When Renfroe asked where the girl was, Woods told him she was upstairs in his room. They went upstairs, and Woods showed Renfroe the body, which was on a blanket on the floor. According to Renfroe, the girl's hair was "all over her head" and her pants were pulled down to her knees. Renfroe testified that Woods told him that she tried to take his money and had a seizure while they were "tussling."

**{¶15}** Renfroe testified that he did not see the girl again after that night, but said he asked his girlfriend, Robin Whitsett, to stay with him the next two nights because he was afraid to be in his room alone. Whitsett confirmed that Renfroe told her what had happened, and that she stayed with him for two nights. Renfroe said that he moved out of the boarding house several days after Woods showed him the body, and on Saturday, December 17, 2011, he contacted the Cleveland police and gave them a video-recorded statement regarding what he knew about Bolten's death. Renfroe identified Bolten from state's exhibit No. 283 as the woman he saw lying on the floor of Woods's room. Cleveland police detective Wally Everett confirmed that until Renfroe came forward, the police had no suspects in the case and were unaware of any connection between the house on Edna Avenue and Bolten's death.

**{¶16}** Eddie Mae Greene testified that in December 2011, she lived next door to the rooming house on Edna Avenue. She said that she knew Woods as "Tink," and that

he would come visit with her at her house almost every day. Greene testified that she never saw Woods with any females except for the night, which she thought was a Monday, when she saw him walking on Edna Avenue with a woman. Greene stopped and spoke with the woman and Woods, who told her he had to hurry because his friend "got to pee." Greene said the woman appeared to be disoriented. At trial, Greene identified Bolten from a picture as the woman she saw Woods with that Monday night. She also identified a black boot found close to Bolten's burned body as one of the boots Bolten was wearing when she saw her with Woods.

{¶17} Greene testified that she next saw Woods on either Thursday or Friday of that week, after Bolten's burned body had been discovered several days earlier. Greene said that as she and her son came out of their house, she saw Woods coming up the street on his bike. When Woods stopped, she told him that she wanted to ask him to accompany them to the store because it was getting dark out and "you know, it's a crazy psycho murderer out here." Greene said that Woods told her, "you're right; there is a crazy psycho murderer out here." Greene gave a statement to police detectives in March 2012. She testified that shortly after giving her statement, she received a letter from "Tink," in which Woods advised her that the "crazy things" people were saying about him were not true, and that he "could never ever do anything as horrible as that." He told Greene "I think it was the guy name [sic] Thomas Renfro [sic]," and also told her that she and her son had seen him and the woman on Sunday, December 11, not Monday, December 12.

{¶18} Sandra Guzay, a production foreman at Springco Metal Coating, testified that Woods worked the 7 a.m. to 3 p.m. shift at Springco under her supervision for approximately five years. She said that in December 2011, Woods was a tool man, a physically demanding job that involved repeatedly lifting and placing heavy racks onto conveyor belts. Guzay reviewed Woods's attendance records for October and November 2011, which indicated that he was at work on time every day. For the week of December 12 through December 16, 2011, however, the attendance records showed that Woods worked Monday, December 12, called off on Tuesday and Wednesday, and then came to work on Thursday, December 15, 2011. Guzay said that when she saw Woods in the cafeteria on December 15 and confronted him about missing two days in a row, she noticed that his hands were swollen. Guzay said that she had never seen Woods's hands swollen like that before.

{¶19} Cleveland police detective Michael Smith testified that Woods was arrested at Springco on December 19, 2011. Three days later, the police executed a search warrant in his room, and found a mop, a bottle of bleach, a partially-empty bottle of paint thinner, and stacks of newspapers. Eric Burchak, a Cleveland police fire-arson investigator who examined the scene where Bolten's burned body was found and investigated the fire, testified that whoever set the fire used two accelerants — newspaper and a medium petroleum distillate such as paint thinner.

{¶20} Finally, Dr. Nasir Butt, a supervisor in the DNA section of the Cuyahoga County forensic science laboratory of the Cuyahoga County medical examiner's office,

testified that Woods's DNA was found in swabs taken from under the fingernails of Bolten's right hand. He conceded, however, that DNA can be transferred to someone's fingernails during sex.

{¶21} The trial court denied Woods's Crim.R. 29 motion for acquittal regarding the aggravated murder count, but granted defense counsel's request for a jury instruction regarding murder and voluntary manslaughter. The jury subsequently found Woods guilty of all counts, and this appeal followed.

## II. Analysis

### A. Sufficiency of the Evidence

{¶22} Woods was convicted of aggravated murder in violation of R.C. 2903.01(A), which provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." A person acts purposely when it is his specific intent to cause a certain result. R.C. 2901.22(A). In his first assignment of error, Woods contends that the trial court erred in denying his Crim.R. 29 motion for acquittal regarding Count 1 because there was no evidence of prior calculation and design.

{¶23} Crim.R. 29(A) provides for a judgment of acquittal if the evidence is insufficient to sustain the conviction. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is

whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶24} Prior calculation and design "indicates studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." *State v. Taylor*, 78 Ohio St.3d 15, 19, 1997-Ohio-243, 676 N.E.2d 82. The Revised Code does not define "prior calculation and design," but the Ohio Supreme Court

> has interpreted the phrase to require evidence of "more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8, 11, 1978 Ohio LEXIS 644, 381 N.E.2d 190. While "[n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves," "momentary deliberation is insufficient." *State v. D'Ambrosio*, 67 Ohio St.3d 185, 196, 1993-Ohio-170, 616 N.E.2d 909, quoting the 1973 Legislative Service Commission Comment to R.C. 2903.01.

*State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 38.

{¶25} The existence of prior calculation and design is determined on a case-by-case basis analysis of the facts and evidence. *State v. Jones*, 91 Ohio St.3d 335, 345, 2001-Ohio-57, 744 N.E.2d 1163. Although there is no bright-line test for determining prior calculation and design, the Ohio Supreme Court has found that several factors, including whether the accused and the victim knew each other, whether there was thought or preparation in choosing the murder weapon or murder site, and whether the act was "drawn out" or "an almost instantaneous eruption of events" should be weighed with

the totality of the circumstances surrounding the murder to determine whether there was prior calculation and design. *Taylor; State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976). In this case, considering these factors and the totality of the circumstances, we find that even construing the evidence in a light most favorable to the prosecution, there was insufficient evidence of prior calculation and design.

{¶26} First, as the state concedes, Woods found Bolten, a known prostitute, "on the street." They did not know each other before the day of the murder and did not have a strained relationship that would cause Woods to plan her murder. Moreover, there is no evidence that Woods gave thought and preparation to choosing the murder site. Common sense dictates that if Woods had actually given thought to choosing the murder site, he would not have taken Bolten to his room in a boarding house that he shared with at least eight other people and where there would likely be witnesses. *See State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 24.

{¶27} With respect to the third factor, the state contends that although the murder act itself was not necessarily drawn out, the murder occurred over time because Woods lured Bolten to his room to kill her. The state asserts that the evidence indicates that Woods planned to murder Bolten because he dropped his head when Frazier honked the horn at Bolten as they were walking on the street, and he "shuffled" Bolten past Greene when he saw her outside the boarding house as he and Bolten were going to his room. But these actions are consistent with those of someone who does not want others to know

that he plans to have sex with a prostitute; they are insufficient, without more, to demonstrate that Woods planned to kill Bolten.

**{¶28}** The state also contends that Woods planned to kill Bolten because she was able to wave at Frazier when Frazier honked her horn at her, but some time later when Greene saw her, she seemed disoriented or intoxicated, thereby suggesting that Woods must have given her something to make her disoriented and facilitate his plan to kill her. This is pure speculation by the state; there is no evidence that Woods forced or even offered Bolten, a known drug user, anything to cause her to be disoriented.

**{¶29}** Likewise, despite the state's assertion otherwise, Renfroe's testimony that Woods would not open the door when he knocked and that he heard Bolten gasping while Woods whispered to her is similarly insufficient to demonstrate that Woods planned to kill Bolten in his room. Renfroe admitted that the noises and the whispering could have been because Woods and Bolten were having sex, and it is not unlikely that Woods would not open the door if he and Bolten were   in the midst of sex.

**{¶30}** The state also argues that there was sufficient evidence of prior calculation and design because Woods tried to conceal the murder by burning Bolten's body.  But burning the body after the murder does not necessarily indicate *prior* calculation and design.

**{¶31}** The state contends that this case is similar to *State v. Williams*, 8th Dist. Cuyahoga No. 82364, 2003-Ohio-6342, in which this court affirmed a conviction for aggravated murder.  In *Williams*, the defendant told the police that he found the body of a

15-year-old girl in the woods. He said he met the victim at a gas station, had sex with her behind the station, left, and then several hours later, discovered her body in the woods. After talking to the police, the defendant contacted his friend and his father and asked them to give him an alibi for that night. When the police interviewed him several days later, the defendant admitted that he actually had sex with the victim in the woods, refused to give her money after she threatened him, and then blacked out and killed her.

{¶32} This court found "substantial evidence of prior calculation and design," finding that although the defendant and the victim were strangers to each other until the night of the murder, they spent the evening together riding in a car with the defendant's friend, who dropped them off at the defendant's house. This court reasoned:

> The victim was found in a secluded area of woods near the appellant's home; clearly, he gave thought to choosing an out-of-the-way murder site. Though the actual killing of the victim may have taken a mere moment or two, the events of that night can not be considered "an instantaneous act," but instead consisted of a plan that took hours, first to lure the victim to his home and then to proceed to the crime scene. Therefore, we find that there is sufficient evidence to show prior calculation and design.

*Id.* at ¶ 37.

{¶33} But *Williams* is distinguishable from this case. There is no evidence that Woods lured Bolten to his room; she was a known prostitute and Frazier testified that when she saw Bolten with Woods, she presumed that Bolten was "tricking" as usual. Moreover, Woods did not take Bolten to a secluded place to murder her; he took her to his room in a ten-room boarding house. And Woods's 2012 letter to Greene, in which he

told her that she saw him with Bolten on Sunday, December 11, and not Monday, December 12, is not indicative of *prior* calculation and design.

{¶34} In short, the evidence in this case was insufficient to support a finding of prior calculation and design and, accordingly, there was insufficient evidence to support Woods's conviction for aggravated murder. There was, however, sufficient evidence that Woods committed murder in violation of R.C. 2903.02, which provides that "[n]o person shall purposefully cause the death of another." Accordingly, Woods's conviction for aggravated murder is modified to the lesser included offense of murder. *See State v. Reddy*, 192 Ohio App.3d 108, 2010-Ohio-5759, 948 N.E.2d 454, ¶ 35 (8th Dist.), (appellate court has authority to modify a conviction to a lesser included offense supported by the record, rather than ordering an acquittal or a new trial).

{¶35} The first assignment of error is sustained.

B.      Manifest Weight of the Evidence

{¶36} In his second assignment of error, Woods contends that his conviction for aggravated murder was against the manifest weight of the evidence. In light of our resolution of the first assignment of error, we will consider Woods's arguments as they relate to his conviction for murder.

{¶37} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. A reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving

conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 388, 1997-Ohio-52, 678 N.E.2d 541. A conviction should be reversed as against the manifest weight of the evidence only in the most exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶38} We find that Woods's conviction for murder was not against the manifest weight of the evidence. The evidence was clear that Woods was the last person seen with Bolten before her burned body was discovered on property close to the boarding house where Woods lived. The evidence was also clear that Renfroe heard Bolten gasping for air while Woods whispered to her, and that it sounded like her head was covered or in a pillow or blanket. The medical examiner testified that he was confident that Bolten was murdered, and testified further that although he could not state the specific cause of death, in light of the bruise found under Bolten's tongue, one of the most likely causes of death was suffocation. And, despite Woods's assertion to Renfroe that Bolten died of a seizure while they were "tussling," the medical examiner was unequivocal that Bolten did not die of a seizure. Finally, there was no evidence that Woods called 911 to report Bolten's alleged seizure and, in fact, the evidence was clear that he tried to burn the body after the murder. In light of this evidence, the jury did not lose its way in finding that Woods purposefully caused Bolten's death. Woods's conviction for murder is not against the manifest weight of the evidence, and, therefore, the second assignment of error is overruled.

**{¶39}** Woods's convictions and sentence for gross abuse of a corpse and tampering with evidence are affirmed. Woods's aggravated murder conviction is modified to murder in violation of R.C. 2903.02, the conviction is affirmed as modified, the sentence for aggravated murder is vacated, and the matter is remanded for resentencing on the murder conviction.

It is ordered that the parties share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed as modified herein, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KATHLEEN ANN KEOUGH, PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
EILEEN T. GALLAGHER, J., CONCUR