[Cite as *State v. Kerr*, 2016-Ohio-8479.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE OF OHIO,                          )        CASE NO. 15 MA 0083
                                        )
    PLAINTIFF-APPELLEE,                 )
                                        )
VS.                                     )        OPINION
                                        )
PAUL LEE KERR,                          )
                                        )
    DEFENDANT-APPELLANT.                )

CHARACTER OF PROCEEDINGS:        Criminal Appeal from the Court of
                                 Common Pleas of Mahoning County,
                                 Ohio
                                 Case No. 14 CR 1033

JUDGMENT:                        Affirmed.

APPEARANCES:

For Plaintiff-Appellee:           Atty. Paul J. Gains
                                  Mahoning County Prosecutor
                                  Atty. Ralph M. Rivera
                                  Assistant Prosecuting Attorney
                                  21 West Boardman St., 6th Floor
                                  Youngstown, Ohio 44503

For Defendant-Appellant:          Atty. Edward Czopur
                                  DeGenova & Yarwood, Ltd.
                                  42 North Phelps Street
                                  Youngstown, OH  44503

JUDGES:

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated:  December 28, 2016

ROBB, J.

{¶1}    Defendant-Appellant Paul Lee Kerr appeals his conviction entered in the Mahoning County Common Pleas Court.  A jury found him guilty of aggravated murder with a firearm specification, after which the trial court found him guilty of having a weapon under disability.  Appellant contends there was insufficient evidence of the prior calculation and design element of aggravated murder.  Next, he contests the jury instruction provided after the jury asked for clarification of a prior charge (which prior charge was given after the jury advised it was deadlocked).  Lastly, Appellant believes his attorney provided ineffective assistance of counsel by focusing on his interpretation of a comment made by the victim's wife during her recorded interview.  For the following reasons, Appellant's assignments of error are overruled, and the trial court's judgment is affirmed.

## STATEMENT OF THE CASE

{¶2}    On September 30, 2014, Lenzie Morgan Jr. was shot in the side of the head while sitting in his living room chair.  The victim died from the gunshot wound two weeks later.   Appellant was indicted for aggravated murder with a firearm specification and having a weapon under disability.  Appellant elected to have the court hear the charge of having a weapon under disability while the jury heard the aggravated murder case.

{¶3}    The trial testimony established the victim permitted Appellant to stay at his house in Youngstown, Ohio.  A few days prior to the shooting, Appellant arrived with his clothes in a plastic grocery bag.  (Tr. 194).  The victim's wife had never met Appellant, but the victim knew Appellant through boxing and a landscaping job.  (Tr. 192).  The night before the shooting, the victim went to bed while his wife and Appellant stayed up all night.  (Tr. 197-198).  At some point, the victim's wife sat on the bed in the room where Appellant was staying.  (Tr. 201, 261).  At another point, Appellant cut the finger of the victim's wife with a knife.  She testified Appellant mentioned being "blood sisters" and "said something about Aryan Brothers, KKK." (Tr. 211, 230-231).

{¶4}    After the victim woke up, he accused his wife of being unfaithful to him with Appellant.  (Tr. 243).  The victim's wife testified she drove Appellant to a store in

the morning to purchase cigarettes and a lighter; she purchased the items for him. (Tr. 198-199, 243). When they returned home, an argument started. (Tr. 244). The victim's wife and Appellant both told the victim nothing happened between them. (Tr. 202, 266). The victim sat in the living room chair while calling his wife names. (Tr. 202, 220, 227). The victim told Appellant he had to pay for his wife stating, "she's not a cheap ho." (Tr. 220). The victim voiced his opinion to some of his wife's family members through texts and a call. (Tr. 202, 227, 272).

{¶5} The victim's wife testified the victim was upset but did not yell. (Tr. 201-202, 212, 262). She said the victim instructed Appellant to leave his house, but Appellant did not leave the house right away. (Tr. 201-202, 270). He packed some of his belongings into his plastic grocery bag. (Tr. 201). He used her phone to call someone for a ride. (Tr. 203). Appellant left the living room, went to the kitchen, and returned after approximately three minutes with a gun. (Tr. 204, 233). According to the victim's wife, Appellant walked up to and shot the victim in the side of the head as he was sitting in his chair. (Tr. 204, 233). She described the gun as old-fashioned, wooden, and short-barreled. (Tr. 238, 241).

{¶6} After the shooting, Appellant ran out of the house. The victim's wife watched through a window as Appellant fled to a waiting blue truck. (Tr. 207, 244, 246-247). She then left the house screaming; she approached her neighbors who were exiting their house. (Tr. 252, 320). They called 911 at 8:02 a.m. (Tr. 434). One of the neighbor's testified he saw Appellant at the house in the days prior to the shooting. (Tr. 324). He did not hear a gunshot before seeing the victim's wife run toward him. (Tr. 320). He and his father approached the house and prevented the victim's wife from re-entering as they were concerned the shooter could still be there. (Tr. 321, 323). From the doorway, the victim could be seen trying get up from his chair. His wife was crying, calling his name, and saying, "hold on, baby." (Tr. 320, 322).

{¶7} The first responding officer arrived within minutes. A neighbor in the crowd said he saw a bald white male run toward a side street and enter a blue and white truck. (Tr. 378). The victim's wife reported the victim was shot by Paul, a bald white man who had been living with them for a couple days. She identified Appellant

from a photograph he left in the house with his belongings. (Tr. 376). He also left his grocery bag of clothes and a bag of pills. (Tr. 263-264, 402, 412, 475).

{¶8} A detective arrived and took the wife's statement. He also took her to the police station and conducted a video recorded interview. On cross-examination of the victim's wife, defense counsel questioned her as to various statements made in the interview. Counsel asked if she recalled talking to herself after the detective left the interview room; the witness did not recall this. Defense counsel then asked, "Do you recall saying in the room by yourself: It's like that they don't know why I shot Lenzie?" She immediately answered this was not true. (Tr. 257). An objection was occurring at the time, after which counsel asked the question again. The witness denied she made this statement. (Tr. 258).

{¶9} During the detective's testimony, the prosecution referred him to the portion of the interview where he left the interview room and asked him if he had reviewed the video. He said he had. The prosecution asked if, at any time, the victim's wife made a statement that she was the killer; he responded in the negative. (Tr. 483). On cross-examination, defense counsel noted the prosecution asked the detective if the victim's wife said she was the killer and inquired "But she does say, it's like they don't know why I killed Lenzie; right?" The detective responded, "No." (Tr. 527).

{¶10} During the interview, the victim's wife disclosed Appellant's use of her phone. The detective called the number Appellant dialed that morning. The woman who answered was Appellant's mother. (Tr. 485). The detective testified Appellant's mother said she had a bolt-action .22 rifle in her home but it was gone. (Tr. 485-486). Appellant's mother testified she did not tell the detective that her .22 caliber long rifle was missing. (Tr. 446, 448-449, 451, 453). She told him her son said he lived in the woods. (Tr. 447). She directed the detective to Appellant's employer, who owned a blue pickup truck. (Tr. 486). Appellant's employer testified her company owned a "mousy purple, blue" truck with a logo on the side, which her husband drove. (Tr. 365). She witnessed no animosity between Appellant and the victim when they were at her house the day before the shooting. (Tr. 370).

**{¶11}** On the same day as the shooting, Appellant was arrested while lying behind a pile of brush in a park in New Castle, Pennsylvania. (Tr. 457-459). There was gunshot residue on his shirt and a mixture of blood on his shorts, but the blood was insufficient to compare to the victim's DNA. (Tr. 286, 293, 307). A gunshot residue test was also performed on the victim's wife soon after the shooting. There was gunshot residue on her left hand but not on her right hand; she testified she was right-handed. (Tr. 261, 308, 314). The projectile recovered from the victim was of a small caliber and consistent with ammunition used in a .22 caliber weapon. (Tr. 414-415).

**{¶12}** The victim's step-son (the son of the victim's wife) testified to meeting Appellant the day before the shooting. His parents were not home, and Appellant answered their door. (Tr. 337-338). Appellant offered to sell the son a gun for $50, which Appellant described as a .22 caliber, single-shot long rifle that had been sawed off. (Tr. 340-341). The son returned later to tell the victim about Appellant's offer and to say he was concerned about Appellant staying with them. (Tr. 342-343). On the morning of the shooting, the son received a text message from the victim at 7:30 a.m. which stated, "just caught D and that dude in the bed. He got to go." (Tr. 345). The son responded, to which the victim replied at 7:45 a.m., "We're not doing nothing. We're just laying here." (Tr. 346). The son provided these texts to the police.

**{¶13}** Besides receiving an instruction on aggravated murder, the jury was also instructed on the lesser included offense of murder. The jury found Appellant guilty of aggravated murder with a firearm specification, and the court found Appellant guilty of having a weapon under disability. In a May 12, 2015 entry, the court imposed a sentence of three years of actual incarceration on the firearm specification followed by life without parole on the aggravated murder. The court also imposed a consecutive sentence of thirty-six months for having a weapon under disability. On appeal, Appellant sets forth three assignments of error.

ASSIGNMENT OF ERROR ONE: PRIOR CALCULATION & DESIGN

**{¶14}** Appellant's first assignment of error provides:

"The State presented insufficient evidence to obtain a conviction for aggravated murder as the evidence did not establish prior calculation and design."

{¶15} Whether the evidence is sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). An evaluation of a witness's credibility is not involved in a sufficiency review. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. Rather, the question is whether the evidence, if believed, is sufficient to sustain the conviction. *See id.* at ¶ 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *See, e.g., Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring).

{¶16} In viewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *See State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999). *See also State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). Circumstantial evidence inherently has the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2000). A conviction cannot be reversed on grounds of sufficiency unless the reviewing court determines that reasonable minds could not have found the elements of the offense proven beyond a reasonable doubt. *Id.* at 484. A reversal on sufficiency bars retrial. *Thompkins*, 78 Ohio St.3d at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 41, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

{¶17} Appellant was indicted for aggravated murder in violation of R.C. 2903.01(A), which sets forth the following elements: purposely and with prior calculation and design causing the death of another. A person acts purposely when it is the person's specific intention to cause a certain result. R.C. 2901.22(A). The offense of murder involves purposely causing a death, and aggravated murder has the additional element of prior calculation and design. *Compare* R.C. 2903.01(A) *with* R.C. 2903.02(A).

{¶18} Appellant takes issue with the element of prior calculation and design. He urges momentary deliberation is insufficient. He notes the alleged shooting appeared to be a spontaneous eruption of events and was not drawn out. Appellant points to an Eighth District case modifying an aggravated murder conviction to murder after finding insufficient evidence of prior calculation and design. *See State v.*

*Hill*, 8th Dist. No. 98366, 2013-Ohio-578, ¶ 1. *See also as State v. Woods*, 8th Dist. No. 99630, 2014-Ohio-1722, ¶ 34.

**{¶19}** "Prior calculation and design" is a single indivisible element. *State v. Taylor*, 78 Ohio St.3d 15, 18, 676 N.E.2d 82 (1997). The legislature employed this element in 1974 to replace the prior statutory element of "deliberate and premeditated malice" so as to require more than instantaneous or momentary deliberation. *Id.* at 18-19. Prior calculation and design involves "studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001), quoting *Taylor*, 78 Ohio St.3d at 19.

**{¶20}** The phrase has been interpreted to require evidence of "a scheme designed to implement the calculated decision to kill" and "more than the few moments of deliberation permitted in common law interpretations of the former murder statute." *State v. Conway*, 108 Ohio St.3d 214, 220, 2006-Ohio-791, 842 N.E.2d 996, ¶ 38, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). Where the evidence "reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 61 (2003), quoting *Cotton*, 56 Ohio St.2d 8 at ¶ 3 of syllabus.

**{¶21}** However, there is no bright-line test; each appeal must be evaluated on a case-by-case basis under the totality of the evidence presented in a particular case. *Jones*, 91 Ohio St.3d at 345-346, citing *Taylor*, 78 Ohio St.3d at 20. The amount of care and time spent planning and analyzing the crime are not critical factors in themselves. *Taylor*, 78 Ohio St.3d at 20. *See also State v. D'Ambrosio*, 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993) (neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but momentary deliberation is insufficient). Prior calculation and design can exist even if the defendant "quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001),

citing, *e.g.*, *State v. Palmer*, 80 Ohio St.3d 543, 567-568, 687 N.E.2d 685 (1997) (double homicide occurring quickly after traffic accident).

{¶22} Although there is no bright-line test, certain questions have been outlined as pertinent in ascertaining prior calculation and design: did the defendant and the victim know each other; if so, was the relationship strained; did the defendant give thought to or evince preparation in choosing the murder weapon or murder site; and was the act drawn out or was it an almost instantaneous eruption of events. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 56-60. Appellant acknowledges he had a prior relationship with the victim that became strained. He urges there is no evidence he gave thought to the choice of murder weapon or the location of the murder. He suggests he would not have shot the victim in front of an eyewitness if he had time for thought. Appellant also contends the act was not drawn out but flowed from the argument with the victim.

{¶23} The state points to evidence the argument immediately prior to the shooting lasted at least 30 minutes: the victim texted his step-son at 7:30 a.m. to say he caught his wife and Appellant in bed; the victim texted again at 7:45 a.m. to report he was not doing anything; the victim's wife testified she ran out of the house after Appellant fled to a waiting truck; she also testified she ran to the neighbor's house; the neighbor testified he was exiting his house when the victim's wife ran over screaming; the neighbor testified his mother immediately called 911; he called 911 as well; and the first call to 911 occurred at 8:02 a.m. There is also testimony the victim made an accusation before Appellant and the victim's wife went to the store and the victim continued his accusations after he woke up, again.

{¶24} As conceded, Appellant had a newly strained relationship with the victim. The victim accused Appellant of acting inappropriately with his wife. The victim was in the process of ejecting Appellant from his home. In addition, Appellant engaged in behavior suggesting he believed he had a meaningful relationship with the victim's wife: he cut her finger with a knife and said they were "blood sisters," among other things. The victim was disparaging his wife's character and making his opinions known to her family as well.

**{¶25}** Additionally, there was testimony Appellant did not immediately leave the house even though the victim ordered him to leave. The house was not large, and Appellant did not have many belongings to collect; he carried his belongings into their house in a plastic grocery bag. Appellant used the phone of the victim's wife even though the victim had just accused her of being unfaithful to him with Appellant.

**{¶26}** Furthermore, Appellant left the room to retrieve the gun. The victim's wife testified Appellant returned to the living room after three minutes. The victim was not looking at Appellant when Appellant entered the room with the gun. The victim was sitting in a chair. Appellant shot the victim without saying anything. It is notable Appellant shot the victim in the head. *See, e.g., State v. Campbell*, 90 Ohio St.3d 320, 330, 738 N.E.2d 1178 (2000) (firing shots into a victim's head at close range is crucial evidence related to prior calculation and design). The absence of multiple shots does not detract from these facts as there was evidence Appellant had a single-shot gun. Finally, a vehicle was waiting for Appellant. This vehicle was visible through a window in the house, suggesting Appellant was waiting for his ride before shooting the victim.

**{¶27}** Under the totality of the circumstances presented in this particular case, there is adequate evidence from which to find Appellant engaged in more than instantaneous or momentary deliberation. After construing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the circumstances surrounding the murder show a scheme designed to carry out the calculated decision to cause the victim's death. This assignment of error is overruled as there was sufficient evidence of prior calculation and design.

<u>FACTS ON JURY DELIBERATIONS (FOR ASSIGNMENTS 2 & 3)</u>

**{¶28}** After two days of trial, jury deliberations began on May 6, 2015 at 10:12 a.m. The jury asked to see the video interview of the victim's wife mentioned during trial. At 12:20 p.m., the court advised they could not view the interview as it was not submitted into evidence by either party. The jury went to lunch before 1:00 p.m. and returned to deliberations at 2:00 p.m.

**{¶29}** At 2:45 p.m., the jury advised the court it was deadlocked. The jury's note revealed, "10 Not Guilty 2 Guilty." The trial court provided a supplemental jury

instruction known as a *Howard* charge. (Tr. 663-665). (Appellant takes no issue with this instruction. The Ohio Supreme Court's approved *Howard* charge is set forth below under the second assignment of error.)

{¶30} At 3:38 p.m., the court placed two new jury communications on the record. The jury asked: "The statement from [the victim's wife] – 'It's like they don't know why I killed my husband' was brought up. Are we suppose[d] to disregard that?" The defense agreed the court would need to instruct the jury that the question was not evidence as the witness denied making the statement contained in the defense counsel's question. (Tr. 672, 674). The court reminded the jury it had previously been instructed the evidence does not include counsel's statements. (Tr. 679). The court advised the jury not to draw any inference or speculate on the truth of any suggestion within a question asked by counsel but not answered. (Tr. 680).

{¶31} The other question submitted by the jury inquired: "In your last instruction you spoke to the possibility or responsibility(?) of a juror(s) to change his (her) verdict in deference to the jury's majoritive opinion with the objective to reach a unanimous verdict for the sake of the law. Will you re-explain and expound on this?" Upon reading this question, the judge asked the attorneys, "Did I do that?" Both sides agreed the judge did not so instruct the jury. (Tr. 672). The court advised it would correct any misimpression. The court then gave a second supplemental instruction. (Tr. 675-678). (This second supplemental jury instruction is set forth below, under the second assignment of error where it is contested.)

{¶32} Thereafter, the jury requested to see the state's poster outlining the elements. The court agreed with the request, finding the poster merely reiterated items included in the jury charge regarding the elements. The court adjourned for the night at 6:08 p.m. and ordered the jury to resume deliberations at 8:30 a.m. the next morning. After resuming deliberations on May 7, the jurors asked, at 9:48 a.m., if they could read the testimony of the victim's wife. The court denied this request, instructing the jury to use its collective memory of what was presented. (Tr. 690). At 5:07 p.m., the jury returned with its verdict: guilty of aggravated murder with a firearm specification as charged in the indictment.

ASSIGNMENT OF ERROR TWO: SUPPLEMENTAL JURY CHARGE

**{¶33}** Appellant's second assignment of error reads:

"Appellant was denied his right to a fair trial and due process as the result of the trial court's improper and inaccurate second Howard charge."

**{¶34}** Appellant acknowledges he failed to object to the second supplemental jury instruction and therefore waived all but plain error. *See State v. Underwood*, 3 Ohio St.3d 12, 13, 444 N.E.2d 1332 (1983). "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).

**{¶35}** Application of the plain error doctrine in order to reverse a judgment requires an obvious error affecting substantial rights and the outcome of the trial. *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, 3 N.E.3d 135, ¶ 30. Even so, the recognition of plain error is discretionary with the reviewing court. *See State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 62. *See also* Crim.R 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Steele*, 138 Ohio St.3d 1 at ¶ 30, quoting *State v. Long*, 53 Ohio St.2d 91, 94, 372 N.E.2d 804 (1978), ¶ 3 of syllabus.

**{¶36}** When examining a jury instruction for errors, the reviewing court must consider the jury charge in its entirety to determine whether the charge probably misled the jury in a matter materially affecting the defendant's substantial rights. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 135. A single jury instruction shall not be judged in artificial isolation, but rather it must be viewed in the context of the overall charge. *State v. Jones*, 91 Ohio St.3d 335, 348-349, 744 N.E.2d 1163 (2001). Furthermore, when reviewing a jury instruction for plain error, the totality of the entire record should be considered. *Steele*, 138 Ohio St.3d 1 at ¶ 33.

**{¶37}** In *Howard*, the Ohio Supreme Court crafted a supplemental jury charge to avoid problems encompassed in the *Allen* charge, which singled out jurors in the minority by urging them to reconsider their position rather than treating all jurors even-handedly. *State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989), rejecting *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The charge approved in *Howard* reads:

> The principal mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others. You should consider it desirable that the case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.

*Howard*, 42 Ohio St.3d at 25-26.

{¶38} Appellant concedes the trial court's initial supplemental jury instruction here coincided with this *Howard* charge, and he takes no issue with this charge. Appellant argues the trial court subsequently abandoned *Howard* in its second supplemental charge. After repeating the jury's question, which mentioned jurors changing their verdict in deference to the majority, the trial court instructed:

I apologize if that's what you think I said. I scrupulously intended to instruct you [-] not to address the minority in any way. It is an address to all of you. In fact, in my opinion - - and I told my magistrate this. This is called the Howard charge (indicating). In the law - - years ago there was a case called Illinois versus Allen. I think that was the name of it. When I was a bailiff we used to use it. It did address the minority jurors and did say to them, you're probably wrong - - not necessarily in that language. If you're the minority you better think this through because the majority probably knows better than you. That's been found to be unconstitutional. That's bull crap that the minority is wrong and the majority is right. *In fact, in my opinion, this charge should be modified, the one I gave you, to make it crystal clear that if you are in the majority you have all the more reason to examine your position because it's real easy when there's a bunch of us and everybody's nodding their heads and say, got to be right because there is more of us, and you could be wrong and need to change your position.*

So I greatly apologize if I gave you that impression at all. Fair enough. I have read it and read it again and I don't think it addresses the minority. All that this charge is trying to say to you is that we've put you together to decide the case and we want you to do that. And if you can do it, then you got to do it. It is your duty. If you can't do it, that's okay, too. That happens sometimes. But it can't happen just because you don't want to go along or you're obstinate or you're unreasonable or whatever. You got to think this thing through. *You don't decide the case we're going to call another jury in and start again and somebody's*

*going to have to decide it. So that's a lot of time and effort and a lot of resources wasted if indeed you're here to decide this; okay?* But I would urge you, no matter what position you are in, you need to reexamine where you are.

What this instruction says is pretty good stuff, I thought. If there's disagreement all jurors should reexamine their positions - - all jurors - - given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, as the instruction on reasonable doubt says. [The court then defined reasonable doubt.]

So jurors for acquittal should consider whether their doubt is reasonable considering that it is not shared by all of the other, equally honest, who have heard the same evidence with the same desire to arrive at the truth and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.

That's what I read to you. So if you're in the majority you better take a look and think it through and don't just rely upon the fact that it's a majority. You need to think it through again. If you're in the minority you need to think it through again and forget whether you're majority and minority. You need to think about what the facts of this case have proven or failed to prove.

(Emphasis added to two main contested portions.) (Tr. 675-678).

**{¶39}** Rather than clear up the confusion, Appellant believes the court further confused the jurors and misled them. He acknowledges the language in the *Howard* charge is not an absolute mandate. *Howard*, 42 Ohio St.3d at 25 (although opining the American Bar Association's suggested instruction was not the preferable approach, the Court noted it would not disapprove of its use). Appellant urges any deviation from *Howard* must: (1) even-handedly call for all jurors to reevaluate their positions; and (2) encourage a unanimous verdict only when one can conscientiously be reached, without advising that a verdict must be reached. *See id.* at 25.

**{¶40}** First, the instruction must be balanced and neutral. *Id.* at 24. Appellant believes the trial court was so concerned with not coercing the minority to change its position that it ended up instructing the majority it was probably wrong. However, the court's instruction does not suggest the majority was probably wrong. Rather, the court informed the jury about an old instruction and told the jury the instruction improperly told the minority they were probably wrong. The court advised the jury that such instruction was ruled unconstitutional.

**{¶41}** It may have been preferable for the court to then refrain from opining the current instruction should be modified to point out to the majority jurors that they had more reason to reexamine their position (because their position is easier due to the confidence that comes from being part of a majority). Nevertheless, the explanation as to which jurors should reexamine their position does not appear prejudicial, especially when read in context of the entire second supplemental charge, the original supplemental charge, and all jury instructions as a whole. In the second supplemental instruction, the court not only instructed those in the majority to reexamine their position but advised all jurors to engage in a reexamination as per *Howard*.

**{¶42}** After the first contested statement, the court explained, "no matter what position you are in, you need to reexamine where you are." (Tr. 677). The court then reread portions of the prior *Howard* charge about jurors for acquittal and jurors for conviction both considering their positions. The court added, "if you're in the majority you better take a look and think through and don't just rely upon the fact that it's a majority. You need to think it through again. If you're in the minority you need to think it through again and forget whether you're majority or minority." (Tr. 678). In summary, this court concludes the trial court did not overcorrect the jury's misinterpretation of the original supplemental charge.

**{¶43}** Next, Appellant takes issues with the portion of the instruction reading: "You don't decide the case we're going to call another jury in and start again and somebody's going to have to decide it. So that's a lot of time and effort and a lot of resources wasted if indeed you're here to decide this; okay?" (Tr. 677). The Supreme Court has ruled: "On the one hand, a supplemental instruction must not be

coercive by stressing that the jury must reach a verdict, a clear misstatement of the law." *Howard*, 42 Ohio St.3d at 23-24. "On the other hand, the instruction must allow the trial judge to remind the jury of the reason a jury is assembled, namely, to reach a unanimous verdict if each juror can conscientiously agree to a verdict." *Id.* at 24. The *Howard* Court desired to "more emphatically encourage the jury to reach a decision, if they can conscientiously do so * * *." *Id.* at 25.

**{¶44}** Appellant complains this portion of the instruction did not encourage a unanimous verdict *only if* one can conscientiously be reached. However, the jury had before it the original (uncontested) *Howard* charge which did so advise. The trial court informed the jury the original charge was "pretty good stuff" and was pointing to the original charge during its second supplemental charge. (Tr. 675, 677). Moreover, just prior to this contested portion of the instruction, the trial court noted: "If you can't do it, that's okay too." (Tr. 677).

**{¶45}** Appellant also believes the court's charge pressured the jury by presuming the state would retry the case. However, the *Howard* charge approved by the Ohio Supreme Court also alludes to a subsequent jury being seated: "You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise there is no reason to believe that more or clearer evidence will be produced by either side." *Howard*, 42 Ohio St.3d at 25-26.

**{¶46}** Lastly, Appellant contests the trial court's mention of wasted time and resources. In one case, the court's supplemental instruction added the following: "Since the trial of this case means a great deal to the parties and to the public, and has been expensive in time, effort and money, the Court urges you to make every reasonable effort to agree upon a verdict." *State v. Williams*, 8th Dist. No. 66864 (July 5, 1995). The Eighth District concluded the reference to these items was not coercive. *Id.* (refusing to find ineffective assistance of trial counsel for failing to object). The Second District found a charge which pointed out that a lot of time and attention was invested in the trial did not improperly coerce jurors to change their position but merely furthered the purpose of the *Howard* charge. *State v.*

*Washington*, 126 Ohio App.3d 264, 283, 710 N.E.2d 307 (2d Dist.1998) (refusing to find plain error).

**{¶47}** In reading all of the instructions as a whole and viewing the contested statements in the context of the entire trial, this court concludes plain error is not apparent. Notably, the second supplemental instruction was provided on the first day of deliberations. Supporting a conclusion that the second supplemental instruction was not coercive, after this instruction the jury deliberated several hours that day and then for an entire day before reaching its verdict. *Compare Howard*, 42 Ohio St.3d at 23 (emphasizing how the jury returned a verdict only one hour after an *Allen* charge was given where almost 2.5 days of deliberation had failed to produce agreement). For all of the foregoing reasons, this assignment of error is overruled.

<u>ASSIGNMENT OF ERROR THREE: ASSISTANCE OF COUNSEL</u>

**{¶48}** Appellant's third and final assignment of error provides:

"Appellant was denied effective assistance of counsel as trial counsel's defense was predicated on a statement by the victim's wife that did not exist."

**{¶49}** We review a claim of ineffective assistance of counsel under a two-part test, which requires the defendant to demonstrate: (1) trial counsel's performance fell below an objective standard of reasonable representation; and (2) prejudice arose from the deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Both prongs must be established; if the performance was not deficient, then there is no need to review for prejudice and vice versa. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

**{¶50}** In evaluating the alleged deficiency in performance, our review is highly deferential to counsel's decision as there is a strong presumption counsel's conduct falls within the wide range of reasonable professional assistance. *Bradley*, 42 Ohio St.3d at 142-143, citing *Strickland*, 466 U.S. at 689. We are to refrain from second-guessing the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). There are "countless ways to provide effective assistance in any given case." *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466

U.S. at 689. Debatable trial strategy very rarely constitutes ineffective assistance of counsel. *See State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987).

{¶51} To show prejudice, a defendant must prove his lawyer's errors were so serious that there is a reasonable probability the result of the proceedings would have been different. *Carter*, 72 Ohio St.3d at 558. Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley*, 42 Ohio St.3d 136 at fn. 1, quoting *Strickland*, 466 U.S. at 693. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding fundamentally unfair due to the performance of trial counsel. *Carter*, 72 Ohio St.3d at 558, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

{¶52} Appellant asserts counsel rendered ineffective assistance by centering the defense on a statement counsel believed the victim's wife made during the video interview. On cross-examination, defense counsel asked the victim's wife, "Do you recall saying in the room by yourself: It's like that they don't know why I shot Lenzie?" She said this was not true and denied making the statement. (Tr. 257-258). The prosecution subsequently asked the detective if the victim's wife made a statement she was the killer, and he answered she did not. (Tr. 483). After noting the prosecutor asked the detective if the victim's wife said she was the killer, defense counsel inquired: "But she does say, it's like they don't know why I killed Lenzie; right?" The detective responded, "No." (Tr. 527).

{¶53} Appellant suggests counsel should not have relied upon a statement that was not heard by others who listened to the interview. If the statement could be heard on the recording, then Appellant urges counsel was ineffective by failing to play the video for the jury. Appellant asks us to consider the sequence of the jury deliberations in evaluating the effect of defense counsel's strategy: the jury asked to see the video statement; the court denied the request as the statement was not submitted into evidence; the jury reported it was deadlocked; the court provided a *Howard* charge; the jury asked for clarification of the *Howard* charge; the jury asked if it was to disregard counsel's question to the victim's wife; the court instructed the jury

not to draw any inference or speculate on the truth of any suggestion included in a question that was asked by counsel but not answered; the court supplemented the *Howard* charge; the jury asked to read the testimony of the victim's wife, which the court denied; and the jury returned a verdict finding Appellant guilty as charged.

**{¶54}** In discussing the matter outside of the presence of the jury, the prosecutor opined she and the detective believed the victim's wife said, "it's like they think that I killed Lenzie." (Tr. 669, 671). Defense counsel believed she said, "it's like that they don't know why I shot Lenzie." Defense counsel explained, "Your Honor, that's what I heard on the video. * * * To me, as many times as I played it – although I had it very clear and very loud right next to the speaker – probably a hundred times I played that thing and that's what it sounded like to me." (Tr. 670-671).

**{¶55}** It does not appear counsel rendered ineffective assistance by voicing his interpretation of the statement made by the victim's wife while she was alone in the interview room or by asking the victim's wife if she made such a statement. There is no indication counsel's question to the victim's wife fell below an objective standard of reasonable representation or was outcome determinative. As the state points out, this strategy was most likely the reason for the jury's initial deadlock and the lengthy deliberations. Moreover, defense counsel's question prompted the detective to reexamine the statement provided by the victim's wife.

**{¶56}** Regarding the failure to have the video played for the jury, defense counsel may have refrained from playing the video because it portrayed the victim's wife in a sympathetic or favorable light, whereas the defense was suggesting it was she rather than Appellant who shot the victim. Counsel may have refrained from playing the video because the disputed portion was not clearly audible. Also, if it was not a prior inconsistent statement, then it would not be admissible under Evid.R. 613.

**{¶57}** As the video is not part of the record, we cannot review it. The victim's wife denied she made the particular statement attributed to her by counsel; the detective denied the victim's wife made the statement; and the prosecutor informed the court defense counsel misheard the words of the victim's wife. It is possible defense counsel changed his mind about his interpretation after learning of the state's interpretation, which could be perceived as unfavorable to the doubt he was

attempting to place in the jurors' minds. A weighing of the risks may have been involved. Our review of trial strategy is highly deferential. Even when an attorney's trial strategy is questionable, the reviewing court should ordinarily refrain from second-guessing tactical decisions made during trial. *State v. Jackson*, 107 Ohio St.3d 300, 317, 2006-Ohio-1, 839 N.E.2d 362, ¶ 138.

**{¶58}** Contrary to Appellant's reasoning, the fact others believed the victim's wife did not make the statement fails to support ineffective assistance of counsel by initially asking the question of the victim's wife. In addition, it has not been demonstrated the results were unreliable or the proceeding was fundamentally unfair due to the performance of trial counsel regarding the statement of the victim's wife. *Carter*, 72 Ohio St.3d at 558, citing *Lockhart*, 506 U.S. at 369. This assignment of error is overruled.

**{¶59}** For all of the foregoing reasons, Appellant's conviction is affirmed.


Donofrio, P.J., concurs.

Waite, J., concurs.